# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| WILLIAM M. WILLETT, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 3:13-CV-101-TLS |
| | ) | |
| CAROLYN COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
|     Defendant. | ) | |

## OPINION AND ORDER

The Plaintiff, William M. Willett, seeks review of the final decision of the Commissioner of the Social Security Administration denying his application for disability benefits. The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

## PROCEDURAL BACKGROUND

The Plaintiff applied for Disability Insurance Benefits on January 5, 2010, alleging a disability onset date of December 5, 2009. The Plaintiff complained to the Disability Determination Bureau (DDB) that "breathing is a very hard process, because my lungs are not functioning properly." (R. at 157. ) The DDB denied the Plaintiff's claim, finding that he could perform other work. The Plaintiff's request for reconsideration was denied, and he then requested, and was granted, an administrative hearing. At the time of his hearing, on June 22, 2011, the Plaintiff was 41 years old.

Judge Dennis R. Kramer heard testimony from the Plaintiff, Dr. James M. McKenna, and a vocational expert. Using the agency's standard sequential five-step analysis, 20 C.F.R. §§ 404.1520 and 416.920, the ALJ issued a decision unfavorable to the Plaintiff. The ALJ found

that the Plaintiff had engaged in substantial gainful employment during the first and second quarters of 2010. The ALJ proceeded to the next steps to address the periods the Plaintiff had not engaged in substantial gainful employment. At step two, the ALJ determined that the Plaintiff's emphysema, chronic obstructive pulmonary disease, chronic bronchitis, asthma, and coronary artery disease were impairments that caused more than minimal limitations in his ability to perform basic work activities. As such, they were severe impairments. The ALJ concluded that the Plaintiff's medically determinable mental impairment of anxiety was not severe.

Step three requires the ALJ to "consider the medical severity of [the] impairment" to determine whether the impairment "meets or equals one of [the] listings in" appendix 1.20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment rises to this level, he earns a presumption of disability "without considering [his] age, education, and work experience." *Id.* at § 404.1520(d). But if the impairment falls short, an ALJ must examine the claimant's "residual functional capacity"—the types of things he can still do physically despite his limitations—to determine whether he can perform this "past relevant work," *id.* at § 404.1520(a)(4)(iv), or, failing that, whether the claimant can "make an adjustment to other work" given his "age, education, and work experience," *id.* at § 404.1520(a)(4)(v). The ALJ determined that the Plaintiff's impairment did not meet or equal any of the listings in appendix 1.

The ALJ described the Plaintiff's residual functional capacity (RFC) as lifting or carrying 20 pounds occasionally and 10 pounds frequently, standing/walking 6 hours in an 8-hour workday, and sitting 6 hours in an 8-hour workday. The ALJ found that the Plaintiff's ability to push and pull was unlimited except for lifting and carrying. The Plaintiff could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel,

crouch, and crawl. The Plaintiff had to avoid even moderate exposure to extreme cold and fumes, odors, dusts, gases, and poor ventilation, and had to avoid concentrated exposure to extreme heat, wetness, and humidity. The ALJ determined that, considering the Plaintiff's age, education, work experience, and RFC, he could perform the requirements of light, unskilled, occupations, such as cashier, office helper, and sales attendant, thus defeating his disability claim at step five.

On December 17, 2012, the Appeals Council of the Office of Disability Adjudication and Review denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008); *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

On February 14, 2013, the Plaintiff filed a Complaint in this Court seeking review of the Commissioner's decision. The matter has been fully briefed.

## STANDARD OF REVIEW

In an appeal from the denial of social security benefits, the court is not free to replace the ALJ's appraisal of the medical evidence with its own. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (stating that the court may not reweigh the evidence or substitute its judgment for that of the ALJ). Instead, the court reviews the ALJ's decision for substantial evidence, 42 U.S.C. § 405(g), meaning that the court ensures that the decision rests on "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When an ALJ recommends that the agency deny benefits, it must first "build an accurate and logical bridge from the evidence to the conclusion." *Clifford v. Apfel*, 227

F.3d 863, 872 (7th Cir. 2000). "In other words, as with any well-reasoned decision, the ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008). Conclusions of law are not entitled to such deference, however, so where the ALJ commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## ANALYSIS

The Plaintiff claims he is disabled and cannot work due to emphysema, chronic obstructive pulmonary disease (COPD), chronic bronchitis, asthma, and coronary artery disease.

The Plaintiff's argument to this Court is that the ALJ committed error as he considered the weight to assign to medical opinions, improperly assessed the credibility of the Plaintiff with regard to exertional demands, and did not fashion an RFC to accommodate the Plaintiff's pulmonary exacerbations. Additionally, the Plaintiff claims that the ALJ erred at step three by offering a perfunctory and unsupported listing analysis.

**A.     Listing Level Impairment**

The Plaintiff asserts that the ALJ's determination that the Plaintiff's breathing impairment did not meet the requirements of Listing 3.02A is not supported by substantial evidence, and that the ALJ's assessment does not account for his steady decline in pulmonary

4

functioning.

Listing 3.02, Chronic Pulmonary Insufficiency, presumes a finding of disability for claimants with "[c]hronic obstructive pulmonary disease due to any cause, with the FEV1 equal to or less than the values specified in table I corresponding to the person's height without shoes." FEV1 refers to one-second forced expiratory volume. According to Table I, an FEV1 measuring equal to or less than 1.35L will result in a finding of presumptive disability for a person who is 66–67 inches tall. 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 3.02A. The ALJ reasoned that, while the Plaintiff's May 4, 2011, pulmonary function test yielded a pre-bronchodilator FEV1 score of 1.11L and post bronchodilator FEV1 score of 1.16L, which would satisfy the listing, Dr. McKenna indicated that these scores could not be used to determine severity longitudinally. This was because the test was performed during a period of exacerbation. Dr. McKenna identified the Plaintiff's December 10, 2009, pulmonary test as a baseline test. The Pre-bronchodilator FEV-1 score was 1.35L and, after administration of the bronchodilator, was 1.89L.

According to the applicable regulations, "[p]ulmonary function studies should not be performed unless the clinical status is stable (e.g., the individual is not having an asthmatic attack or suffering from an acute respiratory infection or other chronic illness)." 20 C.F.R. § 404 app. 1, § 300E. "The values in paragraphs A and B of 3.02 must only be used as criteria for the level of ventilatory impairment that exists during the individual's most stable state of health (i.e., any period in time except during or shortly after an exacerbation)." *Id.* Moreover, the FEV1 "should represent the largest of at least three satisfactory forced expiratory maneuvers," and the "highest values of the FEV1 . . . should be used to assess the severity of the respiratory

5

impairment." *Id.*

The Plaintiff's claim has no merit in light of these requirements. The test performed in May 2011 during a period of exacerbation is not applicable, and previous tests do not fall below the presumptive disability level. A December 2009 test measured the Plaintiff's highest FEV1 values at 1.89L, well over the 1.35 impairment level required to satisfy the listing. In August 2010, the highest level remained above the listing level at 1.49L. Thus, the Court does not find that the ALJ committed error during in his step three findings.

B.    **Residual Functional Capacity**

In assessing the Plaintiff's RFC, an ALJ is to evaluate the "objective medical evidence and other evidence" to determine whether it is consistent with the Plaintiff's subjective statements regarding his impairment. 20 C.F.R. § 404.1529(a), (d)(3). In general, the claimant is responsible for providing the evidence that the ALJ uses to determine the RFC. 20 C.F.R. § 404.1545(a)(3). Evidence offered must be "complete and detailed enough to allow" the ALJ to make a determination of disability, including the RFC to do work-related physical activities. 20 C.F.R. §404.1513(e). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). But an ALJ must only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).

The Plaintiff argues that the ALJ erred by failing to articulate why his pulmonary exacerbations were not included in the RFC findings, and submits that these exacerbations were

supported by opinions from medical sources. Related to this, the Plaintiff submits that the ALJ did not properly weigh the opinions of his treating physicians. The Plaintiff also challenges the adequacy of the ALJ's credibility assessment.

1. *Medical Opinions*

If a treating physician's opinion on "the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the [ALJ] must give it controlling weight." SSR 96–8p; 20 C.F.R. § 404.1527(c)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). The regulations provide that more weight is generally given to the opinion of treating sources who have (1) examined a claimant, (2) treated a claimant frequently and for an extended period of time, (3) specialized in treating the claimant's condition, (4) performed appropriate diagnostic tests on the claimant, and (5) offered opinions that are consistent with objective medical evidence and the record as a whole. 20 C.F.R. § 404.1527(c)(2)(i), (ii). If the ALJ does not give a treating source's opinion controlling weight, the ALJ must consider various factors to determine the weight to assign the opinion. These include the length, nature, and extent of the claimant's relationship with the treating physician; whether the opinion is supported by relevant evidence; the opinion's consistency with the record as a whole; and whether the physician is a specialist. 20 C.F.R. § 404.1527(c). An ALJ, thus, may discount a treating physician's medical opinion if it is internally inconsistent or inconsistent with other evidence in the record. *Clifford v. Apfel*, 227 F.3d 863, 871 (7th Cir. 2000). An ALJ may also discount a treating physician's opinion if it reveals bias due to sympathy for the patient.

*See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The ALJ must give "good reasons" to support the weight he ultimately assigns to the treating physician's opinion. 20 C.F.R. § 404.1527(c).

The ALJ's opinion noted the various opinions before him for consideration, which included: the State agency Physical Residual Functional Capacity Assessment completed by medical consultant Richard Wenzler; a June 2010 letter form Dr. Matthew Teters; a Family and Medical Leave Act employer form completed by treating physician B. Salous; and a Pulmonary Residual Functional Capacity Questionnaire completed by Dr. Al-Ani. The ALJ also considered the hearing testimony of Dr. McKenna.

The ALJ assigned great weight to the State agency Physical Residual Functional Capacity Assessment completed by medical consultant Richard Wenzler. The ALJ found that it was generally consistent with the objective evidence of record. However, the ALJ further reduced the Plaintiff's exposure to extreme cold and pulmonary irritants based on the testimony of Dr. McKenna. The ALJ reasoned that Dr. McKenna was a disability expert familiar with the SSA's disability policies and procedures and had the opportunity to review more recent medical evidence that was not available to the State agency medical consultants and to question the Plaintiff at the hearing.[1]

The ALJ considered Dr. Al-Ani's June 13, 2011, opinion regarding the Plaintiff's functional limitations, as set forth in a Pulmonary Residual Functional Capacity Questionnaire. In the Questionnaire, Dr. Al-Ani noted that the Plaintiff experiences shortness of breath, chest

---

[1] The Court notes that Dr. McKenna asked the Plaintiff two questions at the hearing: if he was still smoking a half a pack of cigarettes a day and what medications he was taking.

tightness, wheezing, episodic acute asthma, episodic acute bronchitis, and coughing as a result of COPD, asthma and a lung nodule. Dr. Al-Ani identified that the recent FEV-1 score of 1.11 or 31%, the FEV-1/FVC ration of 41.52, and the DLCO score of 16.63 or 57% show the Plaintiff's medical impairments. Dr. Al-Ani indicated that the Plaintiff's acute asthma attacks are precipitated by upper respiratory infection, irritants, and cold air changes. He characterized the attacks as "severe" and "usually requiring steroid taper" but typically lasted an average of "2 weeks." Dr. Al-Ani indicated that the Plaintiff could stand and walk less than 2 hours total in an 8-hour workday, could sit approximately 4 hours total in an 8-hour workday, would need unscheduled breaks every 2 hours, and would be absent approximately 2 days per month. (R. at 459–62.)

The ALJ assigned Dr. Al-Ani's opinion little weight on the basis that it was "not supported by the objective evidence of record." (R. at 30.) Specifically, the ALJ took issue with the fact that "Dr. Al-Ani['s] treatment notes do not support his own opinion," as "[s]everal times throughout his records, he indicates that there was no change in the claimant's COPD symptoms or functional capacity, as well as no exacerbations or hospitalizations" and because "[r]adiologic studies indicate that the claimant's pulmonary findings have been stable for more than one year." (*Id.*)

The Plaintiff argues that the ALJ's analysis mischaracterizes the evidence and ignores the totality of the medical evidence of record and, as such, is an insufficient basis for not granting Dr. Al-Ani's opinion controlling weight. The Plaintiff argues that the radiological studies cited by the ALJ, in fact, support Dr. Al-Ani's opinion. A chest x-ray from April 28, 2009, revealed diffuse pulmonary hyperexpansion compatible with a history of COPD. (R. at 267.) A chest

9

x-ray from July 1, 2009, showed hyperinflated lungs with bullous changes in the lung bases. (R. at 256.) A CT scan of the chest from July 22, 2009, showed moderate to severe emphysematous changes, a nodule in the right upper lobe, a nodule in the left lower lobe, and a focal region of irregular density in the mid-lung. (R. at 264–66.) A chest x-ray from December 16, 2009, showed hyperinflation which "could represent underlying change from allergic bronchitis or asthmatic-type condition or COPD." (R. at 427.) A CT scan from March 2, 2010, showed severe bilateral emphysema and documented "no significant change" from prior studies. (R. at 268.) A CT scan from December 30, 2010, showed bullous emphysematous changes with centrilobular emphysema in the upper lung fields and a persistent irregular density in the right mid-lung field. On January 10, 2011, Dr. Matthew Koscielski, who was filling in for Dr. Al-Ani that day, observed wheezing. (R. at 414.) Dr. Koscielski diagnosed "dyspnea with or without activity" and COPD with "no change in symptoms or functional capacity; no exacerbations or hospitalizations." (R. at 415, 417–18.) A CT scan from April 26, 2011, revealed no change from the December 30, 2010 exam. (R. at 415.)

      The Plaintiff asserts that any indication of stability or "no changes" in the record should be reasonably construed as meaning the condition is still severe. Indeed, the ALJ does not explain how the studies, even if stable for more than a year leading up to the April 26, 2011, exam would contradict any of the functional limitations that Dr. Al-Ani opined in June, after nearly two years of treating the Plaintiff. The ALJ does not attempt to link any of the specific limitations, such as standing and walking less than 2 hours total in an 8-hour workday, sitting approximately 4 hours total in an 8-hour workday, and taking unscheduled breaks every 2 hours, with the objective evidence. The ALJ's explanation is inadequate to justify his decision to reject

the treating physician's opinion. Moreover, the ALJ provides no analysis of the other factors from 20 C.F.R. § 404.1527(c), which appear to weigh in favor of assigning Dr. Al-Ani's opinion more than the "little weight" the ALJ assigned. He treated the Plaintiff for nearly two years before offering his opinion, specializes in breathing disorders, and specifically cited appropriate diagnostic testing to support his opinion. The Court does not ultimately decide the weight to assign to Dr. Al-Ani's opinion, but simply notes that the ALJ should consider these factors, as well as others listed in the regulations, on remand.

**2.      *Credibility Determination***

The Plaintiff challenges the ALJ's credibility determination, arguing that it contributed to an incorrect RFC determination. A court reviews an ALJ's credibility determination deferentially but when "the determination rests on 'objective factors or fundamental implausibilities rather than subjective considerations such as a claimant's demeanor, appellate courts have greater freedom to review the ALJ's decision.'" *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (brackets omitted) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

The ALJ's written opinion acknowledges the Plaintiff claims that his conditions cause "difficulty breathing, shortness of breath, severe chest pain, and nine to ten flare-ups of bronchitis per month that last 15 to 20 minutes each." (R. at 28.) Additionally, the Plaintiff indicated that smoke and dust aggravated his symptoms and that, due to his symptoms, "he has difficulty lifting and standing, sits 5 to 51/2 hours per day, does not sleep well at night, and has significant difficulty with activities of daily living." (*Id.*) The ALJ concluded that the objective evidence did not fully support these allegations. He wrote:

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

A detailed review of the objective evidence of record indicates that the claimant's treatment notes do not support the limitations as alleged. Prior to the claimant's alleged onset date, the claimant was hospitalized from June 30, 2009 to July 2, 2008 [sic] due to chest pain (Exhibit 1F). Chest x-rays were consistent with COPD. On July 2, 2009, the claimant underwent a stress test, with was negative; there was no evidence of exercise-induced arrhythmias, he had a normal hemodynamic response to exercise, there [were] no exercise-induced ST segment deviations, and there was negative evidence of ischemia (Exhibit 19F/7.)

While the claimant has sought treatment for his COPD, emphysema, and asthma with both his primary care physicians and his pulmonary specialist, Dr. Ismail Al-Ani, he has not been hospitalized due to his respiratory impairments. Additionally, while the claimant has reduced the amount he smokes, he continues to smoke despite repeated recommendations from his physicians to quit (Exhibits 5F, 10F, 18F, and 19F). In October 2009, Dr. Al-Ani diagnosed the claimant with COPD and prescribed Spiriva, Pro Air, and Theophylline (Exhibit 10F/57–58). The claimant also sought treatment with Dr. Matthew Teters for COPD exacerbation and was prescribed Medrol Dose Pak and Zithromax (Exhibit 10F/31–32.)

While a December 2009 pulmonary function test revealed severe obstructive ventilating impairment with significant bronchodiolator response with air trapping and hyperinflation and reduced diffusion capacity, all consistent with anatomical emphysemas well as significant bronchodilator response consistent with reactive airway disease (Exhibit 18F/22), his fiberoptic bronchoscopy was normal (Exhibit 10F/56). Additionally, while a March 2010 CT revealed sever emphysematous changes with upper lobe prominence, there was no significant change in the bilateral nodules and stable right hilar lymph node (Exhibit 2F). On March 24, 2010, Dr. Al-Ani noted that the claimants COPD was stable on Spiriva, his pulmonary nodule was stable, and while he has dyspnea on walking, test saturations did not drop below 95% (Exhibit 5F). The treatment notes indicate that the claimant was anxious for a lung transplant; however, impartial medical expert James McKenna, M.D. testified that the claimant is not a candidate for a lung transplant because his breathing is much too good.

While the claimant complained of chest pain, his March 2010 echocardiogram was normal with normal left ventricular systolic function, ejection fraction

> estimated between 50 and 55% without focal wall motion abnormality (Exhibit 6F). There was also no evidence of valvular disease or pericardial effusion. However, due to complaints of ongoing chest pain, on May 10, 2010, the claimant underwent a left heart catheterization (Exhibits 10F/19–20 and 19F/8). While the catheterization was generally unremarkable, it revealed non-obstructive disease in the LAD (Exhibit 10F/19–20.)
>
> The claimant continued to seek treatment with his physician at Main Street Medical Group and pulmonologist Dr. Al-Ani for routine treatment and exacerbations of his COPD and asthma (Exhibit 10F/1). However, while he complained of chest pain, nurse practitioner Dan Tom indicated that it was likely pleuritic in nature given the results of his heart catheterization (Exhibit 10F/4). In November 2010, Dr. Sean Halleran noted that the claimant's symptoms were largely unchanged and has stable nonexertional and pleuritic midsternal chest discomfort (Exhibit 19F/5). Records also indicate that he started smoking again (Exhibit 19F/5). More recent records indicate that there was no change in the claimant's COPD symptoms or functional capacity, as well as no exacerbations or hospitalizations (Exhibit 20F/12). The claimant's April 2011 chest CT was stable with no evidence of malignancy and radiologist Dr. Eldon Olson noted that the findings have been stable for more than one year (Exhibit 21F). The claimant underwent pulmonary function testing in May 2011 showing an FEV1 of 1.11 (Exhibit 21F); however, as noted earlier, this testing was completed during an exacerbation rendering it unusable for measuring longitudinal severity.

(R. at 28–29.)

A claimant's "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). Despite the lengthy recitation of objective medical evidence, the ALJ does not indicate how the treatment notes fail to support the limitations of difficulty lifting and standing, difficulty sleeping, and significant difficulty with activities of daily living, and instead support an RFC that allows for lifting 10 pounds frequently, and standing or walking 6 hours in a day. For example, the ALJ notes that the Plaintiff has sought treatment for his COPD, emphysema, and asthma but that he has not been hospitalized due to his respiratory impairments since before the alleged onset date. The ALJ does not explain how a failure to need hospitalization is inconsistent with

13

the limitations described by the Plaintiff. The Plaintiff testified that exertion, such as walking a block, caused severe pain for a period of 15 to 20 minutes, that he treated the flare ups with a Pro Air inhaler and an albuterol inhaler through a nebulizer, and then required half an hour to 40 minutes after the treatment to recover. He estimated experiencing three to four flare ups of chest pain per week. The Plaintiff did not suggest that his flare ups necessitated a visit to the hospital, yet the ALJ points to the fact that he had not been hospitalized since before the alleged onset date as objective evidence that does not support his stated limitations.

As part of the credibility assessment, the ALJ noted the results of a December 2009 pulmonary function test, which revealed "severe obstructive ventilating impairment with significant bronchodilator response with air trapping and hyperinflation and reduced diffusion capacity, all consistent with anatomical emphysemas [as] well as significant bronchodilator response consistent with reactive airway disease," but then notes that his "fiberoptic bronchoscopy was normal." (R. at 29.) The ALJ appears to be attempting to determine the significance of these particular medical findings himself, as he does not cite to any medical professional's statements regarding the import of these tests. Likewise, the ALJ notes that while a March 2010 CT revealed sever emphysematous changes with upper lobe prominence, there was no significant change in the bilateral nodules and stable right hilar lymph node. But the ALJ stops well short of explaining the significance of the test results as it relates to the Plaintiff's allegations regarding his symptoms and the limiting effects of those symptoms. The ALJ cites other findings as well, but does not explain their relevance to the Plaintiff's credibility, or explain why he favored one finding over another. For example, the ALJ cites records from April 2011 that indicate that "there was no change in the claimant's COPD symptoms or functional

14

capacity, as well as no exacerbations or hospitalizations." He then acknowledges that pulmonary function testing one month later, in May 2011, showed an FEV1 of 1.11, but states that the testing was "unusable for measuring longitudinal severity" because it was "completed *during an exacerbation*." (R. at 29 (emphasis added).) Thus, although there may have been a period without exacerbations, that period clearly ended. Yet the ALJ ignored the exacerbation except to note that it rendered his pulmonary function testing unusable for measuring longitudinal severity.

Moreover, the absence of an objective medical basis that supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. Other factors to be considered are:

> (i) the individual's daily activities; (ii) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (iii) factors that precipitate and aggravate the symptoms; (iv) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or symptoms; (v) treatment other than medication the individuals receives or has received for relief of pain or other symptoms; (vi) any measures other than treatment that the individual uses to relieve pain or other symptoms; and (vii) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); SSR 96–7p. The ALJ's opinion is short on analysis of these factors. Although the ALJ notes the medications the Plaintiff takes for treatment of his symptoms, he does not indicate their effectiveness, any side effects, or otherwise attach any significance to the medication regime as it relates to the Plaintiff's credibility regarding his symptoms. The ALJ notes that the Plaintiff has not quit smoking, but does not articulate the relevance of the fact. The Plaintiff argues that his failure to quit smoking despite numerous physician recommendations does not go to his credibility, but to the addictive nature of tobacco. *See Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000). In *Shramek*, the court held that the ALJ's conclusion that the plaintiff's

15

failure to quit smoking despite evidence that it could worsen her condition was a misuse of the noncompliance regulation, 20 C.F.R. § 404.1530(a). 226 F.3d at 812. The court noted that the ALJ had not made any finding that the prescribed treatment would restore the plaintiff's ability to work, or that there was any medical evidence directly linking her pain or swelling to her smoking. *Id.* at 813. Importantly, the court went on to find that even if medical evidence had established such a link,

> it is extremely tenuous to infer from the failure to give up smoking that the claimant is incredible when she testifies that the condition is serious or painful. Given the addictive nature of smoking, the failure to quit is as likely attributable to factors unrelated to the effect of smoking on a person's health. One does not need to look far to see persons with emphysema or lung cancer—directly caused by smoking—who continue to smoke, not because they do not suffer gravely from the disease, but because other factors such as the addictive nature of the product impacts their ability to stop. This is an unreliable basis on which to rest a credibility determination.

*Id.*

Because the ALJ relied on this unsound basis, did not adequately discuss the requisite factors for assessing credibility, and failed to explain how objective medical evidence contradicted the claimed limitations, the Court cannot find that his credibility assessment was based on substantial evidence.

## CONCLUSION

For the reasons stated above, the Court REVERSES the Commissioner's decision and REMANDS for further proceedings consistent with this Opinion and Order.

SO ORDERED on September 2, 2014.

        s/ Theresa L. Springmann
       THERESA L. SPRINGMANN
       UNITED STATES DISTRICT COURT
       FORT WAYNE DIVISION